# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA NORTHEASTERN DIVISION

| | |
|---|---|
| SHANNON MOSES, ) | |
| PLAINTIFF, ) | |
| VS. ) | 5:07-cv-1862-JHH |
| MICHAEL J. ASTURE, ) COMMISSIONER OF THE SOCIAL SECURITY ) ADMINISTRATION, | |
| ) | |
| DEFENDANT. | |

## MEMORANDUM OF DECISION

Plaintiff Shannon Moses brings this action pursuant to sections 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 405(g) and § 1383(c), seeking review of the decision of the Commissioner of Social Security denying her application for disability insurance benefits under Title II of the Social Security Act. For the reasons set forth below, the decision denying benefits is due to be affirmed.

## I. PROCEDURAL HISTORY

Plaintiff filed her application for disability insurance benefits on October 15, 2003, with an amended disability onset date of January 1, 2004. Her application was denied initially and plaintiff then requested and received a hearing

before an Administrative Law Judge.  The hearing was held on May 17, 2005 in Decatur, Alabama.  In his July 27, 2005 decision, the ALJ determined that plaintiff was not disabled within the meaning of the Social Security Act and thus ineligible for disability insurance benefits.  (Tr. 19, 27-28.)  After the Appeals Council denied plaintiff's request for review of the decision of the ALJ, that decision became the final decision of the Commissioner, and therefore a proper subject of this court's review.

## II.  STANDARD OF REVIEW

The only issues before this court are whether the record reveals substantial evidence to sustain the decision of the ALJ, see 42 U.S.C. § 405(g); Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the correct legal standards were applied.  Lamb v. Bowen, 847 F.2d 698, 701 (11th Cir. 1988); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  Section 405(g) and 1383(c)  mandate that the Commissioner's findings are conclusive if supported by "substantial evidence."  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported

by substantial evidence.  See id. (citing Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence.  Dyer, 395 F.3d at 1210 (citing Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)).  "It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Martin, 894 F.2d at 1529 (quoting Bloodsworth, 703 F.2d at 1239) (other citations omitted).  If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings.  Phillips v. Barnhart,  357 F.3d 1232, 1240 n.8 (11th Cir. 2004).  While the court acknowledges that judicial review of the findings of the ALJ is limited in scope, the court also notes that review "does not yield automatic affirmance.."  Lamb, 847 F.2d at 701.

### III.  FACTS

Plaintiff was born on August, 30, 1972, and, at the time of the hearing, was thirty-two years old.  (Tr. 20, 158.)  She graduated from high school.  (Tr. 20, 159.)  Plaintiff had previously worked as a cashier/checker and a receptionist at a doctor's office. (Id.)  Plaintiff stated that she has a paralyzed collar bone.  (Id.)  At the hearing, she also testified that she was disabled because of pain in her neck

and shoulder, migraine headaches, limited use of her left arm, and a herniated disc in her cervical spine.  According to plaintiff, due to these injuries she has been unable to engage in substantial gainful activity since January 1, 2004.  (Id.)

Plaintiff's medical history began with a fractured left clavicle, sustained at birth, which resulted in brachial plexus palsy.  (Tr. 122.)  She has had some difficulty with her left arm throughout her life as a result of this injury.  Plaintiff testified that this injury has gradually gotten worse with time.  (Tr. 162, 163.)

Plaintiff's medical records begin on January 15, 2004, with a consultative physical examination by Dr. Will R. Crouch.  (Tr. 109-10.)   The physical examination revealed that plaintiff was 5'7" tall and weighed 284 pounds, with a blood pressure of 150/70.  (Id.)  She has some enlargement with a firm mass over the anterior left shoulder and left clavicle area, with a marked decrease range of motion.  (Id.)  He found decreased motor function, consistent with nerve injury, which was "probably from the original shoulder injury and fractured clavicle at birth."  (Tr. 110.)  Finally, Dr. Crouch noted plaintiff's obesity.  (Id.)

A little over one month later, on February 26, 2004, plaintiff was seen by Dr. Jay Solori for "left upper extremity pain."  (Tr. 122.)  Dr. Solori's physical examination noted mild tenderness in the C-spine, with neck and scapula pain on Spurlings.  (Id.)  Dr. Solori noted that plaintiff was areflexic in the extremities and

that she exhibited weakness to supination, should abduction and rotation. (Id.) The x-rays of her left should were "unremarkable" and Dr. Solori suggested an MRI of the C-Spine. (Id.) He also instructed plaintiff to work on stretching her shoulder and continue to take Motrin as needed. (Tr. 121-22.) He noted that she may require a NCV at a later date. (Tr. 121.)

On March 8, 2004, plaintiff returned to Dr. Solori for neck and left shoulder pain. (Id.) She stated that there was no change in her condition and that she had pain radiating from her left arm and fingers. (Id.) Dr. Solori's notes indicate that the MRI revealed a herniated nuclear pulposus at C5-6 on the left side. (Id.) He stated that she should return in one to two months and they could consider a neurological referral if she is not improved. (Id.) Three days later, plaintiff picked up a prescription for 800 mg of Motrin. (Id.)

Plaintiff was again seen by Dr. Solori on April 15, 2004. (Id.) She had an epidural shot which caused a lot of neck pain for eight days but then resolved. (Id.) She complained to Dr. Solori that she could not do some things with her arm that she used to be able to do, such as play piano at church, despite her chronic condition. (Id.) A physical examination revealed no change. (Tr. 120.) Dr. Solori discussed her treatment options and plaintiff stated that she did not "want to consider surgery if she can avoid it." (Id.) Dr. Solori stated that "we will try a

5

cervical traction unit, otherwise she is to continue the treatment as previously outlined." (Id.)  There are no further notes from Dr. Solori until June 20, 2005.

An orthopedic examination performed by Dr. Janssen of SportsMed on October 25, 2005, revealed that plaintiff's shoulder skin was intact, but she had very limited ranges of motion in all planes of her left shoulder and was unable to reach the midline of her back.  (Tr. 136.)   She was able to perform flexion with her left arm to eighty degrees, abduction to ninety degrees, and had thirty degrees of external and internal rotation, although there was some weakness while performing the external rotation.  (Id.)  An MRI of plaintiff's left shoulder revealed atrophy changes of the musculature of the left shoulder girdle, which suggested a chronic neuropathic process.  (Id.)  Although her left  rotator cuff was not properly formed, there was no tear, joint effusion or other significant abnormailty.  (Tr. 137.)  A left shoulder arthrogram revealed possible adhesive capsulitis.  (Tr. 131.)  Nerve conduction studies on the left upper extremity showed evidence of borderline, mild, left carpal tunnel syndrome and an old Erb's Palsy or brachial plexopathy.  (Tr. 142.)  Dr. Janssen recommended plaintiff for physical therapy, not surgery, because her Erb's Palsey was not "all that bad."  (Tr. 132.)

On November 8, 2004, plaintiff had gastric bypass surgery, without any complications. (Tr. 133-34, 160.) At the time of the hearing, she had lost eighty (80) pounds since that surgery. (Id.) Plaintiff acknowledged that her back pain has been alleviated to some extent because of her surgery, and plaintiff does not consider them to be a "major problem like it was" before the surgery. (Id.)

Plaintiff was seen by Dr. Vandana M. Maladkar at the Orthopedic Center on February 25, 2005, with a chief complaint of low back pain. (Tr. 126.) Plaintiff told Dr. Maladkar that she had a "long standing history of low back pain for the past ten years," that she was diagnosed with a "bulging disc by a chiropractor several years ago," and that she experienced a "flare up" once or twice a year. (Id.) Plaintiff also informed Dr. Maladkar that her back pain had "definitely improved" since her gastric bypass surgery, but that five days previously "she noted some discomfort in her back and two days ago she felt something pop in her back." (Id.) Her current medications were Lortab liquid at bedtime. (Tr. 127.)

Upon physical examination, Dr. Maladkar noted that the range of motion in plaintiff's extremities was "normal" with no weaknesses or pain revealed in resisted movement. (Tr. 128.) Dr. Maladkar's impression was right sacroiliac strain, and he wanted an x-ray of the lumbar spine. (Id.) About two weeks later, on March 7, 2005, plaintiff returned to Dr. Maladkar and reported that she was

99% better, and without any back pain on that particular day. (Tr. 124.) Dr. Maladkar suggested physical therapy, but plaintiff stated that she could not afford it. (Tr. 125.) Plaintiff could return on an as-needed basis. (Id.) There are no further records from Dr. Maladkar.

On April 25, 2005, plaintiff was again seen by Dr. Janssen for a follow-up evaluation. (Tr. 144.) Dr. Janssen noted that plaintiff had not gone to therapy because her insurance would not cover it and she had not taken any of her anti-inflammatory medications because of her gastric bypass surgery. (Id.) A physical examination revealed diffuse tenderness over the scapular area. (Id.) Plaintiff could not lift her left arm over her head and had to use the other arm. (Id.) There was some numbness in the tip of her index finger, but sensation in the hand area was otherwise good. (Id.) As far as a treatment plan, the plaintiff informed Dr. Janssen that she did not want to be aggressive; plaintiff was prescribed Firbogel to be used over the scapular area and prescribed a home stimulator and instructed to return on an as needed basis. (Id.) There are no further records from Dr. Janssen.

The most recent medical records were from Dr. Solori, dated June 20, 2005. (Tr. 148-49.) Plaintiff saw Dr. Solori for documentation as to her ranges of motion in her left upper extremity. (Id.) Plaintiff performed flexion in her shoulder to fifty degrees, shoulder abduction to thirty degrees, and extension to ten

degrees.  (Tr. 149.)  Passively, plaintiff was able to perform flexion to ninety degrees, abduction to sixty degrees, and extension to fifteen degrees.  (Id.)  She had 5/5 motor functioning in her left upper extremity with internal rotation and extension.  (Id.)  She had mild tenderness in her cervical spine.  (Id.)

At the hearing, plaintiff testified that she had chronic pain in her neck and left shoulder.  (Tr. 161.)  Plaintiff estimated that her pain level was an eight out of ten, four to five days a week, with anything as simple as "rolling a car window down" triggering the pain.  (Tr. 163.)  She stated that the pain is so bad that she has to lie down almost every day.  (Id.)  Plaintiff testified that "the pain goes up [her] neck and gives [her] headaches."  (Id. at 161.)  Those headaches, which plaintiff described as "migraines," occur about once every two weeks, and last a couple of hours up to two to three days.  (Id. at 161-62.)  The pain also goes "down [her] shoulder . . . into her fingers."  (Id. at 161.)

As far as daily activities, plaintiff testified that she cannot do the following household chores: folding and hanging clothes, unloading the dishwasher, sweeping and mopping the floor.  (Tr. 166.)  She can vacuum without assistance, but has her husband "hook" it up.  (Id., Tr. 172.)  She also loads the dishwasher and washes and dries clothes.  (Tr. 172.)  For the last couple of years, she needs assistance "fasten[ing] [her] bra."  (Id.)  Plaintiff does her own hair, with her right

hand, including blow drying her own hair. (Tr. 167.) Her mother curls her hair, if she needs it. (Id.) Plaintiff used to play piano at her church, but she had to stop because her "fingers don't work . . . don't move fast enough." (Tr. 164.) Plaintiff is able to drive. (Tr. 173.) She only goes shopping with her husband. (Id.) She can lift with her right arm, but does not lift anything with much weight with her left hand. (Id.)

Plaintiff's husband, Ernie Moses, also testified at the hearing. (Tr. 169.) He stated that he has to help plaintiff get dressed, including zipping her dress. (Tr. 171.) In addition, he stated that plaintiff cannot lift objects to high places, like on top of the refrigerator. (Id.) Her husband unloads the groceries from the car, although plaintiff could "get them one at a time." (Id.) He testified that she is in a lot of pain, and she lies down almost every afternoon. (Id.) He testified that her pain has gotten worse in the past couple of years, and her ability to do things has decreased. (Tr. 172.)

Vocational expert Karen Vessels testified at the hearing. She classified plaintiff's past work experience as a cashier/checker as semiskilled, light, and her past work experience as a receptionist as semiskilled, sedentary. (Tr. 174.) The ALJ posed the following hypothetical to the vocational expert:

> If you assume an individual of the claimant's age, education and her past relevant work experience . . . and if that individual is limited to sedentary to light work but she's limited in her left upper extremity to no more than occasional handling of small objects weighing less and one to two pounds with the left upper extremity and then only as the bench level.  In other words, she's unable to reach over her head of anything other than at the bench or desk level.  Would such an individual be able to perform [her] prior work activity . . . ?

(Tr. 174-75.)  The vocational expert responded that "she definitely would be able to perform a receptionist position with those limitations."  (Tr. 175.)  In addition, "she would have transferrable skills to a job such as an information clerk . . . a sedentary, semiskilled job" of which "[t]here are approximately 11,000 in the Alabama area and 70,000 nationally."  (Id.)  She would also be able to perform light, unskilled jobs, "such as a counter clerk" of which there are "3,500 in the Alabama area and 100,000 nationally" or "as a cashier II" of which there are "19,000 in the Alabama area and 550,000 nationally" or as "a survey worker" of which there are "1,200 in the Alabama area and 68,000 nationally."  (Id.)  Additionally, plaintiff could perform sedentary, semiskilled jobs such as a telephone solicitor of which there are "over 2,000 in the Alabama area and over 100,000 nationally."  (Tr. 176.)

> The ALJ then posed another hypothetical to the vocational expert:
>
> If she same individual is experiencing pain and discomfort of an eight level, which for this hypothetical would be of such a level as to be a

>distraction and would result in decreased ability to pay attention and to concentrate. Would that affect ability to perform the work as a receptionist, information clerk, cashier, survey worker, telephone solicitor and other jobs?

(Id.) The vocational expert responded that it would affect her ability to do those jobs "[b]ecause of the severity of the pain." (Id.) Additionally, if such a person had to miss more than two days of work on a monthly basis, she would not be able to do those jobs. (Id.) She also would be limited in her ability to take a break, other than fifteen minutes in the morning and again in the afternoon and a thirty-minute lunch break. (Tr. 177.)

## IV. THE DECISION OF THE ALJ

Determination of disability under the Social Security Act requires a five step analysis. See 20 C.F.R. § 404.1520. First, the Commissioner determines whether the claimant is working. Id. Second, the Commissioner determines whether the claimant has an impairment which prevents the performance of basic work activities. Id. Third, the Commissioner determines whether claimant's impairment meets or equals an impairment listed in Appendix 1 of Part 404 of the regulations. Id. Fourth, the Commissioner determines whether the claimant's residual functional capacity can meet the physical and mental demands of past work. Id. The claimant's residual functional capacity is what the claimant can do

despite his impairment.  Finally, the Commissioner determines whether the claimant's age, education, and past work experience prevent the performance of any other work.  Id.  In making this final determination, the Commissioner will use the Medical-Vocational guidelines in Appendix 2 of part 404 of the regulations when all of the claimant's vocational factors and the residual functional capacity are the same as the criteria listed in the Appendix.  If the Commissioner finds that the claimant is disabled or not disabled at any step in this procedure, the Commissioner will not review the claim any further.

The court recognizes that "the ultimate burden of proving disability is on the claimant" and that "the claimant must establish a prima facie case by demonstrating that he can no longer perform his former employment."  Freeman v. Schweiker, 681 F.2d 727, 729 (11th Cir. 1982) (other citations omitted).  Once plaintiff shows that he can no longer perform his past employment, "the burden then shifts to the [Commissioner] to establish that the claimant can perform other substantial gainful employment."  Id.

The ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged amended onset of disability.  (Tr. 27.)  Next, the ALJ found that plaintiff's degenerative disc disease of the cervical and lumbar spine, Erb's Palsy secondary to brachial plexus injury, borderline carpal tunnel syndrome of the left

upper extremity, and obesity were severe impairments, but that these impairments were not severe enough to meet or medically equal a listed impairment. (Tr. 23, 27.) The ALJ then found that plaintiff could perform light and/or sedentary work, with certain restrictions. (Tr. 26, 28.) Those restrictions were that she could lift no more than one to two pounds with her left arm, could move her left arm no more than chest/desk/table level, and could not perform any overhead lifting. (Id.) The ALJ concluded that plaintiff could perform her past relevant work and, therefore, was not disabled under the Act.

## V. PLAINTIFF'S ARGUMENT FOR REMAND OR REVERSAL

The plaintiff seeks to have the ALJ's decision, which became the final decision of the Commissioner following the denial of review by the Appeals Council, reversed, or in the alternative, remanded for further consideration. Plaintiff first argues "that the ALJ did not properly consider her non-exertional impairments including pain within the framework of the pain standard" or the Ruling 96-7p of Social Security. (Pl. Br. at 6.) Plaintiff also contends that the ALJ "concentrated on her congenital injury only, without considering her recent diagnoses, which indicate that the ALJ failed in his duty to develop the record." (Id. at 6-7.) The court rejects both arguments.

### A. Consideration of Plaintiff's Pain

The ALJ explicitly considered plaintiff's alleged nonexertional limitations in making his disability determination. Plaintiff's only evidence of pain are her subjective complaints. The ALJ specifically evaluated plaintiff's subjective allegations of disabling pain and limitations in making his finding as to plaintiff's residual functional capacity, (tr. 26-27), and found them to be not entirely credible. (Tr. 27.) This credibility finding by the ALJ is supported by substantial evidence.

For the plaintiff to establish a disability through testimony of pain or other subjective symptoms, there must be:

> 1) evidence of an underlying medical condition and either 2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or 3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

Brown v. Sullivan, 921 F. 2d 1233, 1236 (11th Cir. 1991). See also Foote v. Charter, 67 F. 3d 1553, 1560-62 (11th Cir. 1995); 20 C.F.R. §§ 404.1529 and 416.929 (2002). "The claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding pf disability." Brown, 921 F. 2d at 1236 (citing Hale v. Bowen, 831 F. 2d 1007, 1011 (11th Cir. 1987)). However, the ALJ may decide not to credit such testimony from a claimant, provided the testimony is discredited explicitly and

with the articulation of explicit and adequate reasons for doing so.  See Hale, 831 F. 2d at 1011; MacGregor v. Bowen, 786 F. 2d 1050, 1054 (11th Cir. 1986).

    The court is satisfied that the ALJ properly applied the pain standard in discrediting the plaintiff's subjective testimony about the severity of her pain, and that the decision of the ALJ is supported by substantial evidence.  The ALJ expressly stated the above standard used in evaluating subjective complaints of pain.  (Tr. 24.)   The ALJ considered all the medical records submitted by the plaintiff pertaining to her ailments (see tr.21-23) and determined that, although the medical evidence of record establishes the existence of the impairments, the objective findings in the medical records did not confirm plaintiff's allegations of pain.  (Tr. 27.)

    Specifically, the ALJ determined that "while there is evidence of a condition, or combination of conditions, which could reasonably be expected to produce the level of pain or other symptoms which the claimant alleged preclude her from working, such allegations are inconsistent with the medical records in evidence, the claimant's lack of willingness to comply with treatment recommendations, and with the opinion of her attending physician indicating that the claimant's Erb Palsey was not 'all that bad.'"  (Tr. 24.)  Although plaintiff contended that her pain has gotten substantially worse in the past few years, the

ALJ specifically found that "the medical records further show that the claimant has indicated that her symptoms associated with her neck are occasional in nature and that she does not consider her neck pain or left arm electric type of pain to be a significant problem." (Tr. 25.)  Similarly, the ALJ noted that plaintiff's "symptoms associated with her lumbar spine are episodic in nature and her limitations related to her lumbar condition occur approximately twice a year." (Id.)  Moreover, plaintiff admitted that her back problems have improved since her gastric bypass surgery due to weight loss.  (Id.)

Additionally, the ALJ noted that plaintiff sought only sporadic treatment for her history of brachial plexus injury.  (Id.)  She did not follow through with any of the treatment recommendations of the doctors, including physical therapy or her anti-inflammatory medications.  (Id.)  After a review of multiple studies of her left shoulder area, plaintiff's attending physician noted that her Erb's Palsy was not "all that bad" and plaintiff was not recommended for surgery.  (Id.)

The court, therefore, concludes that the objective medical evidence provides substantial support for the credibility finding of the ALJ regarding plaintiff's pain.  The ALJ articulated specific reasons for discrediting the plaintiff's testimony regarding her subjective complaints of pain.  As such, the ALJ properly considered plaintiff's alleged nonexertional impairments.

### B. *Failure to Develop the Record*

The Eleventh Circuit has consistently explained that "the ALJ has a basic obligation to develop a full and fair record." Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir.1981). A "full and fair record" not only ensures that the ALJ has fulfilled his "duty . . . to 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts,' " but it also enables us on appeal "to determine whether the ultimate decision on the merits is rational and supported by substantial evidence." Id. (internal quotations and citations omitted).

Moses also argues that the ALJ failed to consider "her recent diagnoses, which indicates that the ALJ failed in his duty to develop the record." This argument fails. The ALJ fulfilled his obligation to develop a full and fair record. He considered all of her alleged impairments and did not focus only on her congenital injury. The ALJ painstakingly examined all the medical evidence presented by Moses and analyzed both her congenital and recent diagnoses.

### VI. CONCLUSION

In summary, the court concludes that the determination of the ALJ that plaintiff is not disabled was supported by substantial evidence and proper legal standards were applied in reaching this determination. The final decision of the

Commissioner, therefore, is due to be affirmed, and a separate order in accordance with the memorandum of decision will be entered.

**DONE** this the   14th   day of July, 2008.

_____
SENIOR UNITED STATES DISTRICT JUDGE